[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This matter was tried to the court on January 10, 2001. Pursuant to a briefing schedule, the parties submitted post-trial memoranda of law for the court's consideration, the last of which was filed on March 16, 2001. For the reasons set forth below, the court finds the issues in favor of the defendant.
 I. PROCEDURAL BACKGROUND
CT Page 6471
The claims of the plaintiff, Donald Carvey, are set forth in the first count of his amended complaint, dated October 4, 2000 (#112). At trial, the second count was withdrawn. Carvey contends that the defendant (Aetna) has breached its duty to defend and indemnify Chris K. Blanchard, the son of Herbert and Mary Ann Blanchard, who were policy-holders of a homeowner's insurance policy issued by Aetna. (Amended Complaint, ¶¶ 11, 14.) Carvey alleges that on February 5, 1996, he was awarded judgment by the court (O'Neill, J.) against Chris K. Blanchard (Blanchard) in the amount of $35,000, based on Blanchard's negligent and reckless conduct in a May 25, 1990 confrontation with Carvey, who was then acting as a police officer for the Town of East Hartford, at Blanchard's parents' home, of which Blanchard was a resident at the time. (Amended Complaint, ¶¶ 4, 9, 10) Carvey further alleges that Aetna received written notice of his claim in June, 1992 (Amended Complaint, ¶ 12) and of the judgment in May, 1996 (Amended Complaint, ¶ 13). With the judgment remaining outstanding, Carvey alleges that he "is fully subrogated to all rights and claims that the said Chris K. Blanchard would have against [Aetna], pursuant to Connecticut General Statutes Section 38a-321, and brings this complaint pursuant to said statute." (Amended Complaint, ¶ 17).
Aetna's supplemental answer and special defenses, dated January 9, 2001, does not contest various of Carvey's factual allegations, as reflected below in the discussion of the parties' stipulation of facts, but denies liability. In addition, Aetna sets forth three special defenses, including, (1) that it properly refused to defend and indemnify because the conduct alleged on the part of Blanchard did not constitute an "occurrence" as defined in the policy; (2) that such conduct constituted an intentional act which is excluded from coverage; and (3) that it acted properly in refusing to defend or indemnify in that it relied on the advice of counsel. The third special defense was not pursued and is deemed abandoned.
The Town of East Hartford intervened in this matter in order to recover monies it had paid to Carvey, its former employee, as workers compensation benefits. All parties were represented by counsel at the trial.
 II. FACTS
The court finds the following facts and credits the following evidence, except as noted. The parties presented a stipulation of facts, thereby narrowing the facts in dispute. Based on that stipulation, the court finds that on or about May 25, 1990, Carvey was employed as a police officer by the Town of East Hartford, and was dispatched to the residence owned by Herbert and Mary Blanchard, at which Blanchard and his CT Page 6472 brother, Daniel Blanchard, also lived. Carvey was responding to a report that vehicles parked at the residence were blocking traffic and that people there were being loud and disruptive. Upon his arrival, Carvey found that many people in the house, yard and street were engaged in drinking and partying. Vehicles parked at and around the residence were blocking the street.
As the result of a confrontation with Blanchard at the residence, Carvey was caused to suffer injuries to his right thumb. At the time of the incident, Blanchard was an insured under a homeowners policy issued by Aetna to his parents. A copy of the policy was submitted as Exhibit 4. In June, 1992, Aetna acknowledged the filing of the civil action brought by Carvey against Blanchard, Daniel Blanchard, and their parents. In December, 1992, and again in January, 1993, Aetna declined coverage under the policy.
In January, 1996, Carvey filed an amended complaint that alleged an altercation between himself and the Blanchard brothers, during the course of which Blanchard injured Carvey's right thumb. In January, 1996, Aetna again declined coverage. Carvey's suit went to trial, after which the court (O'Neill, J.) rendered a judgment in Carvey's favor, in the amount of $35,000, against Blanchard only. Carvey forwarded the court's memorandum of decision, dated February 5, 1996, to Aetna, which again denied that it owes any coverage for this incident to Blanchard. See Stipulation of Facts.
At trial before this court in January, 2001, Carvey testified and described the incident. As he arrived at the residence, wearing a police uniform, in a police car, several people who were outside the house ran off. He knocked on the front door, which was opened by a person who later turned out to be Daniel Blanchard. Carvey went inside, talked with Daniel Blanchard, and observed numerous people in the house, beer kegs in the living room, and liquid all over the floor. Then another, larger person appeared, who turned out to be Blanchard. He was unstable on his feet and his eyes were glassy. He began pushing the front door against Carvey, who now felt as though he was in real trouble in this situation. He pushed Blanchard back and Blanchard stumbled down a flight of stairs into the lower level of the house.
At that point, Carvey saw his opening to get out and took out his night stick, which had a handle. He began walking Daniel Blanchard outside. Once outside, he heard a noise, turned around and saw that the front door had opened. Blanchard came running out the door, and down the steps toward Carvey and Daniel Blanchard. Anticipating physical contact with Blanchard, Carvey put up his hand "like a stop sign, so to speak." (Trial Transcript, p. 27.) Carvey testified as follows: "And I had no idea CT Page 6473 whether he was coming after me or he was coming to get the other fella away from me. I put up my right hand to stop him and — and one of his hands came up and grabbed a hold of which happened to be my thumb and severely twisted it. . . ." (Trial Transcript, p. 5.) At that point, Carvey hit Blanchard with his night stick, tussled with him, and told him he was under arrest, after which Blanchard ran off into the yard. Police backup then arrived. During this incident, Blanchard appeared to be intoxicated. As a result of the incident with Blanchard, Carvey sustained a significant injury to his thumb, which required surgery, and which caused him to miss time from work.
Carvey testified that he did not recall a lot of things which were said at the time of the incident. He prepared a required police incident report, at or near the time when the incident took place, in which he also described what had occurred. (Exhibit A). Carvey agreed that his memory of the 1990 events was clearer at the time of the preparation of his report than it was at the time he testified more than a decade later in January, 2001. Review of his report refreshed his recollection of the events. He agreed that, while they were in the house, Blanchard had threatened to "take care" of Carvey if Carvey did not leave the house. He agreed also with the report's statement that, while they were still in the house, Blanchard began to grab Carvey and to throw him out.
In the police report, Carvey described Blanchard's charge at him from the front door as follows: "[T]he other person came charging out of the front door, and coming at me. I put up my right hand as an initial reaction, and to defend myself. This p-son grabbed my right thumb, and began twisting it. I[n] an instant, I swung my `night-stick' and struck this person on his right side." (Exhibit A, Police Report, dated May 28, 1990, p. 3) At trial, Carvey stated that he now disagreed with his own report. The court does not find credible his belated explanation that, "I may have been assuming that he was intentionally twisting it rather than something that he had held onto as he fell to the ground." (Trial Transcript, p. 28) It is evident that, in light of Aetna's stated reasons for denying coverage, including that coverage was not provided for intentional acts, Carvey modified his description of the incident. His prior, contemporaneous statement, in the police report, is inconsistent with that position, and, to the court, is a credible statement of what actually occurred.
 III. DISCUSSION
Carvey claims that Aetna breached both its duty to defend Blanchard against Carvey's suit against Blanchard and its duty to indemnify Blanchard for the resulting judgment. He claims also that Aetna improperly based its decision to decline to defend on information it CT Page 6474 received through an investigation. In addition he contends that the policy is ambiguous in its usage of the terms "occurrence" and "accident," and that the ambiguity should be construed in favor of the insured and in favor of coverage.
Aetna asserts that, under the policy, the terms of which are not ambiguous, it owed Blanchard neither a defense nor indemnification. In addition, it argues that it did not rely on any outside investigation, beyond the four corners of the operative complaint in the underlying action, in declining coverage.
"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) Tallmadge v. Iroquois GasTransmission System, 252 Conn. 479, 495, 746 A.2d 1277 (2000). Our Supreme Court reiterated, in Tallmadge, that "[a] court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity. . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather from one party's subjective perception of the terms." (Internal quotation marks omitted.) Id., 498.
"Contract language is unambiguous when it has a `definite and precise meaning concerning which there is no reasonable basis for a difference of opinion. . . .'" (Citations omitted.) Levine v. Advest, Inc., 244 Conn. 732,746, 714 A.2d 649 (1998). "The rules of construction are applied only if the language of the contract is ambiguous, uncertain or susceptible of more than one construction." Id.
Moreover, "[a]n insurance policy is to be interpreted by the same general rules that govern the construction of any written contract and enforced in accordance with the real intent of the parties as expressed in the language employed in the policy. . . . The determinative question is the intent of the parties, that is, what coverage the . . . [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy. . . . It is axiomatic that a contract of insurance must be viewed in its entirety, and the intent of the parties for entering it derived from the four corners of the policy. . . . The policy words must be accorded their natural and ordinary meaning . . . [and] any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy. . . . [T]his rule of construction favorable to the insured extends to exclusion clauses." (Internal quotation marks and citations omitted.)Imperial Casualty and Indemnity Co. v. State, 246 Conn. 313, 324-325,714 A.2d 1230 (1998). CT Page 6475
 A.
"Under Connecticut law, an insurer's duty to defend is broader than its duty to indemnify. The general rule is [that] if an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured. . . . Where a complaint in an action . . . states a cause of action against the insured which appears to bring the claimed injury within the policy coverage, it is the contractual duty of the insurer to defend the insured in that action . . . regardless of the duty of the insurer to indemnify. . . . The existence of a duty to defend is determined on the basis of what is found within the four corners of the complaint; it is not affected by facts disclosed by independent investigation, including those that undermine or contradict the injured party's claim. . . . Although the duty to defend is broad, however, it is circumscribed by the language of the insurance contract. The nature of the insurer's duty to defend is purely contractual. There is no common law duty as to which the courts are free to devise rules." (Internal quotation marks and citations omitted; italics in original.)Stamford Wallpaper Co., Inc. v. TIG Insurance, 138 F.3d 75, 79 (2d Cir. 1998).
"The obligation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage."(Internal quotation marks omitted.) Moorev. Continental Casualty Co., 252 Conn. 405, 409, 746 A.2d 1252 (2000). The titles which a plaintiff assigns to his causes of action in his complaint are not determinative. "[I]f the title of the cause of action were controlling, the duty to defend would be manifest." (Internal quotation marks omitted.) Nationwide Mutual v. Mazur, Superior Court, judicial district of New Britain, No. 489231 (June 3, 1999, Robinson,J.).
As noted, Carvey contends that Aetna went beyond the "four corners of the complaint" and improperly relied upon its investigation in declining to defend Blanchard. In particular, in his brief, he "urge[s] this Court to review correspondence from Brian T. Kurnik of Aetna, dated June 17, 1992 (Ex. B) which in its contents advises Attorney Whelton [Carvey's counsel] that Aetna was in possession of the Carvey Complaint. Kurnik also advises that he was engaged in a continuing investigation at the time of his writing and asked for an extension until June 30, 1992. Mr. Kurnik expected to be in a position to refer the matter out for defense by that time. He expected as well to have completed his investigation by that time." (Trial Brief of Plaintiff Donald Carvey And Intervening Plaintiff City of East Hartford, p. 5, hereafter "Carvey's Brief") Carvey CT Page 6476 asks the court to infer from this letter and from Kurnik's letter of September 8, 1992 (Exhibit 7) that Aetna went beyond a reading of the complaint in making its decision. See Carvey's Brief, p. 5-6.
"Because [t]he only kind of an inference recognized by the law is a reasonable one; . . . any such inference cannot be based on possibilities, surmise or conjecture. . . . It is axiomatic, therefore, that [a]ny [inference] drawn must be rational and founded upon the evidence. However, [t]he line between permissible inference and impermissible speculation is not always easy to discern. When we `infer,' we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is `reasonable.' But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reasonable. At some point, the link between the facts and the conclusion becomes so tenuous that we call it `speculation.' When that point is reached is, frankly, a matter of judgment. . . . [P]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. Thus, in determining whether the evidence supports a particular inference, we ask whether that inference is so unreasonable as to be unjustifiable." (Internal quotation marks, citations, and footnote omitted.) State v. Copas, 252 Conn. 318, 338, 746 A.2d 761 (2000).
From review of the evidence presented, the court concludes that the suggested inference is unwarranted. Kurnik's initial letter, dated June 17, 1992 (Exhibit B), also asked Attorney Whelton to "forward all medical bills and reports you have pertaining to your clients injuries as well as any documentation you have pertaining to his lost wages." His subsequent letter, of September 8, 1992 (Exhibit 7), once again asked for "all medical reports and bills." The letter notes that Kurnik "did receive some of the bills you forwarded under cover of July 6, 1992, and would appreciate receiving all corresponding reports as well as any additional bills and reports you may have." In addition, Kumik once again sought information as to Carvey's claim for lost time from work. See Exhibit 7. Rather than indicate that Aetna was conducting an investigation into what actually happened at the time of the incident at the Blanchard residence, this correspondence reflects an effort by Aetna to assemble routine information concerning medical treatment, medical bills, and lost wages.
Aetna's letter of December 3, 1992 (Exhibit C), signed by Harry J. CT Page 6477 Kunze, Manager, Hartford Branch Claim Department, stated that there was no coverage for one or more reasons, including that the complaint failed to allege an "occurrence" or accident and that Carvey's injuries were expected or intended. See Exhibit C. At that time, the operative complaint in the underlying action brought by Carvey against the Blanchards was the original complaint, dated April 15, 1992 (Exhibit J).
In that pleading, Carvey alleged that Blanchard yelled obscenities and profanities at Carvey, and insisted that he would throw Carvey off the premises if he did not leave. (Exhibit J, count one, ¶ 4) Then, Blanchard and his brother grabbed Carvey and began to assault him. (Exhibit J, count one, ¶ 5) Paragraph 6 stated: "During said assault by Defendants on Plaintiff, Defendant Chris K. Blanchard grabbed Plaintiff's right thumb and began twisting it, continuing to shout profanities and obscenities at Plaintiff." (Exhibit J, count one, ¶ 6) Paragraph 7 of the complaint characterized the defendants' actions as "reckless, negligent, and aggressive." In paragraph 11, plaintiff accused Blanchard of having "committed an assault and battery against Plaintiff in violation of the laws of the State of Connecticut." (Exhibit J, count one, ¶ 11)
Notwithstanding Carvey's conclusory description of the events as being "aggressive, reckless, and negligent," a plain reading of the allegations makes clear, for the reasons set forth below at pp. 12-15, concerning the meaning of the policy provisions, that Carvey's injury was not accidental in nature, but rather was the result of intentional conduct.
Based on the correspondence and the clear language of the then-operative complaint, it would be improper to infer that Aetna's decision to decline coverage was based on an investigation, rather than on a review of the "four corners" of Carvey's then-existing complaint. Any other conclusion would be premised on impermissible speculation.
 B.
As noted, whether or not Aetna had a duty to defend must be ascertained from a comparison of the terms of the policy with the allegations made by Carvey in the underlying action. Rather than proceed on the original complaint described above, Carvey went to trial in that case based on his Amended Complaint, dated January 9, 1996 (Exhibit 2). Aetna acknowledged receipt of this pleading by letter, dated January 22, 1996 (Exhibit G), in which it reiterated the previously stated reasons for declining to defend or indemnify.
The homeowners policy issued to Blanchard's parents (Exhibit 4) provides that an "`occurrence' means an accident, including exposure to CT Page 6478 conditions, which results, during the policy period, in: a. bodily injury; or b. property damage." (Exhibit 4, p. 1.) Under Section II, "Liability Coverages," the policy provides, under Coverage E Personal Liability, for the payment of damages and for the provision of a defense "[i]f a claim is made or a suit is brought against any insured for damages because of bodily injury or property damage caused by an occurrence to which this coverage applies, even if the claim or suit is false. . . ." (Exhibit 4, p. 13) The policy also contains an exclusion in Section II, pertaining to Coverage E-Personal Liability, which states that such coverage does "not apply to personal injury or property damage: a. which is expected or intended by any insured." (Exhibit 4, p. 14)
In addition, the policy provides, under Section II — Conditions that an insured has various duties in the event "of an accident or occurrence," including forwarding to Aetna any papers received "relating to the accident or occurrence. . . ." (Exhibit 4, p. 17) Carvey contends that, since the policy does not define the term "accident," the use of the disjunctive "or" between the terms "accident" and "occurrence" creates an ambiguity suggesting that "the Aetna policy allows for more than mere accidental circumstances. . . ." (Carvey's Brief, p. 8)
"Accident" has been defined as "a sudden event or change occurring without intent or volition through carelessness, unawareness, ignorance or a combination of causes and producing an unfortunate result. Webster's Third New International Dictionary of the English Language." ProvidenceWashington Ins. Group v. Albarello, 784 F. Sup. 950, 953 (D.Conn. 1992) (applying Connecticut law). "An accident is an unintended occurrence."Hammer v. Lumberman's Mutual Casualty Co., 214 Conn. 573, 590, 573 A.2d 699
(1990). In analyzing whether or not a policy provides coverage the focus is on whether the event causing the injury was accidental, not on whether the injury was accidental because the damages were unintended. SeeProvidence Washington Ins. Group v. Albarello, supra, 784 F. Sup. 953.
The policy unambiguously defines an "occurrence" as an "accident . . . which results . . . in: a. bodily injury; or b. property damage." The fact that, in another section, concerning the insured's duties, the policy refers to "an accident or occurrence" does not mean that the definition of the term "occurrence" is to be expanded to include a meaning different from that which is clearly stated in the policy.
Although it is obvious to the court that the January, 1996 Amended Complaint (Exhibit 2) was crafted in response to Aetna's denial of coverage, its allegations also reflect a claim which Aetna was not obligated to defend. Paragraph 5 of the first count states that Blanchard approached Carvey, began swearing at him, and told him that if Carvey did CT Page 6479 not leave the residence, "`then he would take care of the Plaintiff.'" (Exhibit 2, first count, ¶ 5) This cannot be construed as other than a threat of intentional physical violence. Then, Blanchard "started to grab hold of the Plaintiff in an attempt to remove the Plaintiff from the Residence." (Exhibit 2, first count, ¶ 6) This, too, was evidence of non-accidental conduct, in which Blanchard followed-up on his threat. Carvey alleges further that "[a]t this point, an altercation developed between the Plaintiff and the Defendants . . . during the course of which [Blanchard] injured the Plaintiff's right thumb." (Exhibit 2, first count, ¶ 7) Webster's Third New International Dictionary defines "altercation" as "warm contention: dispute carried on with feeling (as anger): noisy controversy: wordy strife." Paragraph 8 (and succeeding paragraphs) describes the defendants' actions as "reckless, negligent, and aggressive." (Exhibit 2, first count, ¶ 8)
Seen as a whole, the conduct alleged by Carvey did not fall within the definition of occurrence provided in the policy. Rather, Carvey's injury resulted from Blanchard's intentional conduct, which involved an orally communicated threat of physical violence, followed by physical grabbing in an attempt to throw Carvey out of the house, and an altercation in which Carvey was injured. As pleaded, the event was not an accident, even if Blanchard did not mean to injure Carvey's thumb. Accordingly, Aetna acted within its contractual rights under the policy by declining to provide a defense to Blanchard.
In addition, the policy exclusion for personal injury "which is expected or intended by any insured" also provided a basis for Aetna to refuse to defend Blanchard, its insured. In discerning whether or not conduct was intentional "[i]t is not necessary that the precise injury that occurred be the one intended, so long as the injury was the direct and natural consequence of the intended act." American National FireIns. Co. v. Schuss, 221 Conn. 768, 779, 607 A.2d 418 (1992).
As noted above, a litigant's conclusory characterization of the facts alleged cannot be dispositive. Thus, Carvey's pleading that the acts involved amounted to recklessness does not alter the resolution of this issue.
 C.
Carvey also claims that Aetna breached its duty to indemnify Blanchard. General Statutes § 38a-321 provides that a judgment creditor shall be subrogated to all the rights which the defendant in the underlying action had against its insurer "and shall have a right of action against the insurer to the same extent that the defendant in such action could have enforced his claim against such insurer had such CT Page 6480 defendant paid such judgment."
As noted, in the underlying action, Carvey recovered a judgment in the amount of $35,000 against Blanchard. The court's decision in that case characterized it as a "negligence action." (Exhibit 3, Memorandum of Decision, p. 1). The court found Blanchard to have been "negligent and reckless in a confrontation out on the lawn of the house . . . and as a result the plaintiff's right thumb was injured." (Exhibit 3, pp. 1-2.) Carvey concedes that this earlier decision is not binding on this court. See Carvey's Brief, p. 11. Nevertheless, he urges the court to find it persuasive, noting that Judge O'Neill "had the opportunity to review all pleadings and hear the testimony of officer Carvey and both Blanchard boys. . . ." Carvey's Brief, p. 11. The court notes that, at the time of the incident, Blanchard was not a "boy." According to the police report (Exhibit A), p. 1, Blanchard's date of birth was June 7, 1967. Thus, on May 25, 1990, he was nearing his twenty-second birthday.
The earlier decision has no res judicata effect on the findings to be made by this court. Aetna was not a party in the earlier case. Whether or not Aetna has a duty to indemnify was not an issue addressed in that litigation. Instead, such a determination must be based on the "independent evidence in the trial of the present case." Rochon v.Preferred Accident Ins. Co., 118 Conn. 190, 194, 171 A. 429 (1934); seeJensen v. Nationwide Mutual Ins. Co., 158 Conn. 251, 258-259, 259 A.2d 598
(1969); Skut v. Hartford Accident Indemnity Co., 142 Conn. 388,393-394, 114 A.2d 681 (1955).
Carvey's trial testimony before this court established that his injury was not sustained as a result of an accident. While he and Blanchard were in the house, Blanchard threatened to "take care of him if he did not leave. Then, Blanchard began to grab Carvey and to throw him out. After Carvey went outside, Blanchard came running down the steps toward where Blanchard's brother and Carvey were located. Carvey anticipated physical contact and put his hand up, "like a stop sign." Blanchard grabbed Carvey's thumb and severely twisted it, injuring Carvey. The facts before the court demonstrate that Blanchard's conduct was hardly of an accidental nature. He made a threat of physical violence to a police officer who was acting within the course of his duties and promptly carried it out, first by grabbing him in the house, and then by running at him and grappling with him outside. Under the terms of the policy, Aetna was not required to indemnify Blanchard in these circumstances, since the events did not constitute an occurrence.
In addition, the policy exclusion also applied. As stated above, while Blanchard may not have intended the specific injury which resulted, his actions in charging Carvey (after threatening him and trying to throw him CT Page 6481 out of the house) and severely twisting Carvey's thumb caused personal injury which was expected or intended.
Finally, the court notes that Carvey has provided no Connecticut authority indicating that Blanchard's conduct was accidental based on his intoxicated state. "Plainly, in civil cases it would be against public policy to relieve citizens of the consequences of their acts based upon their voluntary intoxication. It follows that an insured cannot be heard to argue that he did not intend to do an otherwise intentional act on the basis that he was voluntarily intoxicated and thereby claim coverage under an insurance policy that excludes coverage for intentional acts. The law cannot be perverted to reach a result which would be inimical to public policy." Prudential Property and Casualty Co. v. Kerwin,576 N.E.2d 94, 97 (Ill.App. 1 Dist.), appeal dismissed, 580 N.E.2d 133
(Ill. 1991); see Travelers Ins. Co. v. Cole, 631 S.W.2d 661, 664
(Mo.App. 1982) (homeowner under influence of alcohol and drugs shot police officer; "[T]he law must not permit the use of such stimuli to become a defense for one's actions." (Internal quotation marks omitted.)).
 CONCLUSION
For the foregoing reasons, the court finds the issues for the defendant on its first and second special defenses. Judgment may enter accordingly. It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT